# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

      Plaintiff,

vs.                                     No.  CR-04-872 MV

RANDY MONTOYA,

      Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on Defendant's Motion to Suppress **[Doc. No. 30]**, filed August 11, 2004. The Court, having considered the motion, briefs, relevant law and being otherwise fully informed, finds that the motion is well taken in part and not well taken in part and will be **GRANTED in part** and **DENIED in part**.

## BACKGROUND

On April 6, 2004, Task Force Officer Joey Rodriguez received a list from a Walgreen's store in Rio Rancho, New Mexico that Elizabeth Valencia, residing at 1260 Calle San Ysidro Street in Bernalillo, and Randy Montoya, residing at 1313 South Highway 313 in Bernalillo, had made purchases of large quantities of pseudoephedrine products.  Specifically, the list from Walgreens shows that, from January, 2003 to April 2, 2004, Defendant made sixteen purchases of pseudoephedrine and Ms. Valencia made twelve purchases of pseudoephedrine.  According to the list, on some dates, Defendant made more than one purchase in one day.  The list also shows that, on some dates, Defendant and Ms. Valencia purchased pseudoephedrine on the same day.  Each package of pseudoephedrine that was purchased contained 48 pills and each pill contained 60 milligrams of pseudoephedrine.  TFO Joseph Burke testified that, based on his training for and

experience on the clandestine lab enforcement team, the quantity of pseudoephedrine purchased by Defendant and Ms. Valencia was excessive and indicated that the purchases were in furtherance of the production of methamphetamine.  DEA Agent Gregory Strothman testified that pseudoephedrine is the main precursor in the manufacture of methamphetamine and that, based on his training for and experience on the clandestine lab enforcement team, he knows that purchases of large quantities of pseudoephedrine are made in order to manufacture methamphetamine.

Based on the information obtained from Walgreens, on April 13, 2004, at 8:15 a.m., agents and task force officers from the Albuquerque district office clandestine lab team, specifically, Agent Strothman, TFO Rodriguez, TFO Leroy Fuentes, TFO Joseph Burke, TFO Chris French and DEA Special Agent Ron Deist, conducted a "knock and talk" at the address provided by Walgreens for Ms. Valencia.  Agent Strothman testified that Ms. Valencia was very agitated, her movements were jerky and rapid and she continually scratched her arms and legs, all of which Agent Strothman described as signs of being under the influence of methamphetamine.  Agent Strothman testified that the agents asked Ms. Valencia about her large purchases of pseudoephedrine and that, while initially Ms. Valencia explained those purchases as a result of bad allergies, she eventually advised the agents that she had given the pseudoephedrine to her boyfriend, Defendant.  Agent Strothman testified that Ms. Valencia told the agents where Defendant lives and that Ms. Valencia's brother agreed to take the agents to Defendant's residence.

At approximately 8:20 a.m., Ms. Valencia's brother took the agents to Defendant's residence, which was at the address provided by Walgreen's.  Agent Strothman described Defendant's property as a "junk yard" that was enclosed by a cyclone fence with woven aluminum slats.  Photographs introduced at the hearing showed that, in the southwestern corner of the yard, there was a pink travel

trailer along with a blue mobile home and a wooden breezeway between the two, all encircled by a smaller fence.  The remainder of the yard contained junked vehicles and construction equipment.

Agent Strothman testified that the agents went to the exterior side of the fence near the southwestern corner of Defendant's property.  Agent Strothman testified that, as they stood on the exterior side of the fence, he smelled a chemical odor that, based on his training and experience, he associated with the production of methamphetamine.  Agent Strothman further testified that the odor seemed to be emanating from the southwest corner of the property, where the trailer, breezeway and mobile home were located.  According to Agent Strothman, the odor of cooking methamphetamine is "much more than [the] individual chemicals" used in the process and is "very distinctive."  Also according to Agent Strothman, the vapors from cooking methamphetamine are absorbed into various surfaces and the strong smell associated with cooking methamphetamine can linger for some period of time, depending on the length of a cook and the frequency of cooks in a certain location.

TFO Fuentes similarly testified that, upon arrival at the exterior of the southwest corner of Defendant's property,  he detected a strong chemical odor associated with methamphetamine labs.  TFO Fuentes testified that he notified the other agents that he detected an odor of methamphetamine and asked them to confirm what he detected.  According to TFO Fuentes, this odor is distinctive to the manufacture of methamphetamine.  Also according to TFO Fuentes, that same odor has been present at every lab he has processed, even if there had not been methamphetamine cooked there in a while.

TFO Joseph Burke also testified that, when he was standing outside of Defendant's property at the southwest corner, he detected a strong chemical odor that he associated with the manufacture of methamphetamine.  TFO Burke described the odor as a "very distinct chemical odor."  TFO Burke

explained that the odor occurs only when the chemicals used to manufacture methamphetamine are combined, not when the chemicals are present individually.

Agent Strothman testified that the agents were interested in determining whether the structures in the yard were occupied and, if so, whether the occupants would talk to them. According to Agent Strothman, the agents were concerned that, based on the odor, methamphetamine was being produced somewhere in the southwest corner of the yard. Agent Strothman explained that the chemicals produced during the manufacture of methamphetamine are potentially explosive and, for this reason, the production of methamphetamine creates a volatile, hazardous environment.

Agent Strothman testified that TFO Rodriguez used the P.A. system on his truck and shouted, "Is anyone in there?" According to Agent Strothman, he and the other agents stood in the back of the truck and looked over the fence. Agent Strothman testified that, initially, no one appeared.

At that point, Agent Strothman testified, based on the odor that the agents believed signified the production of methamphetamine, TFO Burke and TFO Rodriguez returned to Albuquerque to obtain a search warrant of Defendant's property, Agent Diest and TFO French left to pick up the lab truck containing their protective equipment and TFO Fuentes and Agent Strothman remained to observe Defendant's property.

Agent Strothman and TFO Fuentes both testified that, approximately fifteen to twenty minutes later, Defendant appeared in the breezeway, poked his head out and looked at them. TFO Fuentes testified that he advised Defendant that they were the police and that they wanted to talk to him. TFO Fuentes testified that he then asked Defendant if he could open the gate on the east side of the property. According to TFO Fuentes, Defendant replied, yes, but stated that he had to go inside and retrieve the keys. Defendant then entered the pink trailer. At that point, Agent Strothman testified,

he drove to the east side of Defendant's property, where there was an entrance to the property that was gated and locked. The fence along the east side of the property had a sign that said, "Keep out."

TFO Fuentes testified that, while Defendant was inside the pink trailer, he heard him "milling around." According to TFO Fuentes, he did not believe that it would take that long or create that much noise to find a set of keys to unlock the only entrance to the property and, for that reason, yelled to Defendant to come out of the trailer. TFO Fuentes testified that Defendant remained in the pink trailer for five to seven minutes during which time he yelled once that he was cleaning up and once that he was getting dressed or changing his clothes. According to TFO Fuentes, based on his training and experience and the totality of the circumstances, he was concerned that Defendant's statement that he was "cleaning up" meant that he was trying to hide or dispose of evidence. Because of his concern, TFO Fuentes testified, he continued to yell at him to exit the trailer but, because they were waiting for the search warrant, remained outside of Defendant's property line.

Agent Strothman and TFO Fuentes testified that, after approximately ten minutes, Defendant exited the breezeway and walked toward the east gate, holding a set of keys. Agent Strothman further testified that Defendant stopped approximately three-quarters of the way across the yard, said, "I need to get the right keys," turned around and walked back toward the trailer.

At that point, Agent Strothman testified, both he and TFO Fuentes jumped over the fence into Defendant's yard, Agent Strothman from the east and TFO Fuentes from the west. Agent Strothman explained that he was "thinking destruction of evidence." According to Agent Strothman, he and TFO Fuentes conducted a pat-down search of Defendant. Agent Strothman testified that they directed Defendant to sit down on a crate in the yard; TFO Fuentes testified that they directed him

to sit down on a chair in the yard.  Although they did not handcuff him, Agent Strothman testified that they told Defendant that he was being detained while they were waiting for a search warrant and that he was not free to leave.

Once TFO French and Agent Diest returned to the scene, Agent Strothman and TFO Fuentes conducted a protective sweep of the pink trailer, the breezeway and the blue mobile home.  TFO Fuentes testified that, when he opened the door to the pink trailer, he observed a can of acetone in a small trash can to the left of the door and smelled the odor associated with the manufacture of methamphetamine.  TFO Fuentes further testified that he advised TFO Burke, who was in the process of writing the affidavit to obtain a search warrant, of this discovery.  TFO Burke similarly testified that TFO Fuentes called to advise him that he again smelled a strong odor of chemicals coming from the trailer and saw a can of acetone in the trash can.  TFO Burke explained that he included this information in the affidavit that he was preparing because acetone is used in the manufacture of methamphetamine.

TFO Burke testified that, once he obtained the search warrant from the Court, he returned to Defendant's property and served the warrant.  TFO Fuentes testified that the agents then processed the scene and found what he described as "an operational, not-in-production [methamphetamine] laboratory."  TFO Fuentes further testified that the agents retrieved items from the pink trailer and items wrapped in a blanket outside of the door of the pink trailer which, although they had legitimate uses, in combination were consistent with the manufacture of methamphetamine.  TFO Fuentes further testified that these items are the items most commonly used for the manufacture of methamphetamine in the area.  TFO Burke similarly testified that all of the items seized on Defendant's property can be used in either the manufacture or ingestion of methamphetamine.

TFO Burke testified that he was present when Defendant was read his *Miranda* rights and that Defendant "agreed verbally to make a statement."  According to TFO Burke, Defendant admitted that he had attempted to manufacture methamphetamine eleven times but was successful only two of those times and that he had disposed of his waste products along the arroyos or in trash bins.  There was no testimony presented regarding who advised Defendant of his *Miranda* rights.

A three-count Indictment was filed on May 11, 2004, charging Defendant with conspiracy to manufacture less than 50 grams of methamphetamine, manufacture of less than 50 grams of a mixture and substance containing a detectable amount of methamphetamine and maintaining a place for manufacture, distribution and use of controlled substances.  On August 11, 2004, Defendant filed the instant motion to suppress the evidence discovered and the statements made subsequent to the agents' entry onto his property.  On October 17, 2004, the government filed a response in opposition. Thereafter, on January 27, 2005, the government filed an amended response.  Defendant's reply followed on March 25, 2005.  The Court held an evidentiary hearing on June 22, 2005.  At the conclusion of the hearing, the Court took the matter under advisement.

## DISCUSSION

## I.    Suppression of Evidence Discovered During Execution of Search Warrant

### A.    Whether the Initial Entry onto Defendant's Property was Legal

"It is a 'basic principle of Fourth Amendment law' that searches and seizures inside a home without a warrant are presumptively unreasonable."  *Payton v. New York*, 445 U.S. 573, 586 (1980). In *Payton*, the Supreme Court held that, "[i]n terms that apply equally to seizures of property and to seizures of persons, the Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant."  *Id.*

at 590.  The Supreme Court noted that "'physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed.'"  *Id.* at 585 (citation omitted).  In *Kirk v. Louisiana*, 536 U.S. 635 (2002), the Supreme Court reiterated its holding in *Payton*, holding that as "*Payton* makes plain, police officers need either a warrant or probable cause plus exigent circumstances in order to make a lawful entry into a home."  *Id.* at 638.

The Fourth Amendment's protection of the home from warrantless searches and seizures extends to the curtilage of the home.  *See United States v. Dunn*, 480 U.S. 294, 300 (1987).  What constitutes the "curtilage" of the home "is determined by factors that bear upon whether an individual reasonably may expect that the area in question should be treated as the home itself."  *Id.*  The central question is "whether the area harbors the 'intimate activity associated with the sanctity of a man's home and the privacies of life.'"  *Id.* (citation omitted).  The Supreme Court identified four factors to consider in making the curtilage determination:  "the proximity of the area claimed to be curtilage to the home, whether the area is included within an enclosure surrounding the home, the nature of the uses to which the area is put, and the steps taken by the resident to protect the area from observation by people passing by."  *Id.* at 301.  The Supreme Court noted that "'for most homes, the boundaries of the curtilage will be clearly marked.'"  *Id.* (citation omitted).

In *United States v. Carter*, 360 F.3d 1235 (10th Cir. 2004), the defendant's backyard was separated from the driveway by a fence with a gate.  In the backyard was a garage.  The officers entered the backyard and did a protective sweep of the garage.  The government conceded that "the garage should be treated as a home for Fourth Amendment analysis, and [did] not challenge Defendant's assertion that the backyard should likewise be treated as a home because it [was] within the curtilage of the residence."  *Id.* at 1241.

In the instant case, there does not appear to be any dispute that Defendant's fenced-in yard is the curtilage of his home. The yard is clearly marked, as it is surrounded by a fence and has a locked entrance. The fence along the east side of Defendant's property has a sign that says, "Keep out." In addition, the yard is included within an enclosure surrounding Defendant's mobile home, and is in close proximity to the mobile home. Accordingly, the Court finds that the fenced-in yard is the curtilage of Defendant's home. As set forth above, police officers need either a warrant or probable cause plus exigent circumstances in order to make a lawful entry into a home. The Fourth Amendment extends this protection to the curtilage of a home. Thus, the relevant inquiry is whether the agents' warrantless entry onto Defendant's property was done with probable cause plus exigent circumstances.

### 1.     Probable Cause

In the context of a search, probable cause exists "'when circumstances known to a police officer are such as to warrant a person of reasonable caution in the belief that a search would reveal incriminating evidence.'" *United States v. Chavez*, 812 F.2d 1295, 1299 (10th Cir. 1987) (citation omitted). In determining whether there is probable cause, the Court must "look at the totality of the circumstances of each particular case." *United States v. Vazquez-Pulido*, 155 F.3d 1213, 1216 (10th Cir.) (citation omitted), *cert. denied*, 525 U.S. 978 (1998). Probable cause "does not require facts sufficient to establish guilt, but does require more than mere suspicion." *Id.*

In the instant case, the credible evidence shows the following facts and circumstances. Together, Defendant and his girlfriend, Ms. Valencia, made thirty-two purchases of pseudoephedrine in a three-month period. Based on their training and experience, the agents believed that purchases of this quantity indicated the manufacture of methamphetamine. Ms. Valencia advised the agents that

she had given the pseudoephedrine that she purchased to Defendant.  Ms. Valencia exhibited physical symptoms of methamphetamine use.  When Defendant made his pseudoephedrine purchases, he listed his address as 1313 South Highway 313 in Bernalillo.  Ms. Valencia confirmed that this was his address, and her brother took the agents to Defendant's residence at that address.  Agent Strothman, TFO Fuentes and TFO Burke all testified that, upon arrival at the outside of the fence surrounding the southwest corner of Defendant's yard, they smelled an odor unique to the manufacture of methamphetamine.  Taken together, these facts and circumstances would have led a reasonable person to believe that a search of Defendant's property would reveal evidence of a methamphetamine lab.  Accordingly, the agents had probable cause.

### 2.      **Exigent Circumstances**

It is the government's burden to prove that exigent circumstances exist.  *See United States v. Scroger*, 98 F.3d 1256, 1259 (10th Cir.), *cert. denied*, 520 U.S. 1149 (1997).  In assessing whether the government has met this burden, the court is "'guided by the realities of the situation presented by the record.'"  *United States v. Rhiger*, 315 F.3d 1283, 1288 (10th Cir.), *cert. denied*, 540 U.S. 836 (2003) (citation omitted).  Moreover, the court is directed to "evaluate the circumstances as they would have appeared to prudent, cautious and trained officers."  *Id.* (citation omitted).  This determination "ultimately depends on the unique facts of each controversy."  *Scroger*, 98 F.3d at 1259.  The Tenth Circuit has defined exigent circumstances as arising when:

> (1) the law enforcement officers . . . have reasonable grounds to believe that there is immediate need to protect their lives or others or their property or that of others, (2) the search [is not] motivated by an intent to arrest and seize evidence, and (3) there [is] some reasonable basis, approaching probable cause, to associate an emergency with the area or place to be searched.

*United States v. Anderson*, 981 F.2d 1560, 1567 (10th Cir. 1992) (citing *United States v. Smith*, 797 F.2d 836, 840 (10th Cir. 1986)).

"Threats to public safety are widely accepted as one of the exigent circumstances exceptions to the Fourth Amendment's warrant requirement." *Rhiger*, 315 F.3d at 1288. In addition, exigent circumstances can be established by showing a concern that evidence may be destroyed. "'When officers have reason to believe that criminal evidence may be destroyed, . . . or removed, . . . before a warrant can be obtained, the circumstances are considered sufficiently critical to permit officers to enter a private residence in order to secure the evidence while a warrant is sought.'" *United States v. Carter*, 360 F.3d 1235, 1241 (10th Cir. 2004) (citation omitted). The Tenth Circuit set forth "four requirements for a permissible warrantless entry when the police fear the imminent destruction of evidence." *Scroger*, 98 F.3d at 1259. Such an entry must be:

> (1) pursuant to clear evidence of probable cause, (2) available only for serious crimes and in circumstances where the destruction of evidence is likely; (3) limited in scope to the minimum intrusion necessary, and (4) supported by clearly defined indicators of exigency that are not subject to police manipulation or abuse.

*Id.* (citing *United States v. Aquino*, 836 F.2d 1268, 1270 (10th Cir. 1988)).

The credible evidence presented at the hearing establishes that the agents' entry onto Defendant's yard meets the four *Aquino* factors. First, as set forth above, probable cause existed. Second, the manufacture of methamphetamine is a serious crime and both Agent Strothman and TFO Fuentes reasonably feared that Defendant would destroy evidence if he returned to the trailer. Defendant did not surface from the trailer until fifteen or twenty minutes after the agents arrived and used a P.A. system to make contact with any residents of the trailer. When Defendant did appear, he poked his head out, told the agents that he needed to retrieve keys to open the gate and then

-11-

disappeared into the trailer for another five to seven minutes.  Defendant was noisy when he was inside the trailer, and kept shouting excuses for his delay including telling the agents that he was cleaning up and changing his clothes.  It was reasonable for TFO Fuentes to be concerned that "cleaning up" meant that Defendant was destroying evidence.  In addition, when Defendant reappeared, the agents observed that he had not changed his clothes.  Although Defendant walked toward the gate with a set of keys, he stopped before he reached the gate, turned around, and said he had the wrong keys.  Given the length of time that Defendant had been in the trailer looking for the keys, in addition to the fact that the key he needed was the key to open the only gate to his property, it was reasonable for the agents to fear that Defendant's statement was a pretext and that, if allowed to reenter the trailer, he would destroy evidence.[1]  Third, the agents' warrantless entry onto Defendant's property and the protective sweep conducted thereon were limited in scope to ensure the safety of the officers.  Fourth, the warrantless entry was supported by clearly defined indicators of exigency and there is no evidence that these indicators were subject to police manipulation or abuse.

The Court thus finds that the agents' warrantless entry onto Defendant's property was based on probable cause and exigent circumstances.  Accordingly, there was no Fourth Amendment violation.

---

[1]  Defendant argues that his statement that he needed a different key and the fact that he walked back toward the trailer did not create any exigency that did not already exist before Defendant exited the trailer.  Even if the exigent circumstances were in existence for several minutes before the agents jumped over the fence, however, this does not mean that the agents' actions were unwarranted or that the exigency did not still exist when the agents decided to jump over the fence.  If anything, the agents' testimony that Defendant could have been destroying evidence before he exited the trailer only means that the agents likely would have been warranted in acting even sooner than they did.

**B.**      **Alternative Arguments Regarding the Sufficiency of the Search Warrant**

**1.**      **Whether the Search Warrant is Based on False Statements**

According to Defendant, there was no operating methamphetamine lab on his property, nothing was hooked up and all of the containers with chemicals allegedly associated with the manufacture of methamphetamine were closed.  Accordingly, Defendant argues that the allegation in the affidavit in support of the search warrant that the agents detected a chemical odor associated with the manufacture of methamphetamine was false.  Defendant urges the Court to disregard the claims of the officers in this case and to find as a factual matter that their statements are so internally inconsistent and self-serving as to be not credible.  According to Defendant, the affidavit in support of the warrant is inconsistent because it states in different places that the officers detected the odor upon arrival at the property and that the officers detected the odor upon opening the pink trailer.

As set forth above, Agent Strothman, TFO Fuentes and TFO Burke all testified that, upon arrival at the fence surrounding the southwest corner of Defendant's property, they smelled an odor unique to the manufacture of methamphetamine.  The Court finds that this testimony was credible. Moreover, the Court does not find that the affidavit written by TFO Burke in support of the search warrant was inconsistent.  Rather, the affidavit states, and the testimony presented at the hearing confirmed, that TFO Fuentes smelled the odor that he associated with the manufacture of methamphetamine first when he arrived at the property and *again* when he opened the door to the pink trailer.  In addition, Agent Strothman testified that the vapors from cooking methamphetamine can be absorbed into various surfaces and that the smell associated with cooking methamphetamine can linger for some period of time.  Similarly, TFO Fuentes testified that the same odor was present at every lab he processed in the past, even if there had not been methamphetamine cooked there in

-13-

a while.  Accordingly, the fact that no methamphetamine was being produced at the time of the search does not call into question the credibility of the agents' testimony.  Defendant thus has failed to meet his burden to show that the allegation that the agents smelled an odor that they associated with the manufacture of methamphetamine upon arrival at the property was false.  Accordingly, there is no basis for the Court to consider whether the affidavit would have lacked probable cause without this allegation.

### 2.        Whether the Search Warrant Lacks Probable Cause

Defendant next argues that the affidavit in support of the search warrant, even with the allegedly false statement about the agents' detection of a chemical odor, is insufficient to establish probable cause for issuance of the search warrant.  Under the Fourth Amendment, "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched and the persons or things to be seized."  U.S. Const. Amend. IV.  The Tenth Circuit has explained:  "Because of the 'strong preference' for searches conducted pursuant to a warrant, the Supreme Court has instructed us to pay 'great deference' to a magistrate judge's determination of probable cause."  *United States v. Nolan*, 199 F.3d 1180, 1182 (10th Cir. 1999) (citing *Illinois v. Gates*, 462 U.S. 213, 236 (1983)).  Thus, the court should uphold the magistrate judge's determination of probable cause "if the 'totality of the information contained in the affidavit provided a substantial basis for finding there was a fair probability that evidence of criminal activity would be found.'"  *United States v. Jones*, 69 Fed. Appx. 401, 404 (10th Cir. 2003) (citing *Gates*, 462 U.S. at 232), *cert. denied*, 540 U.S. 1127 (2004).  The magistrate judge's task in issuing a search warrant "is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit . . . there is a fair probability that contraband or evidence of a crime will be

found in a particular place." *Nolan*, 199 F.3d at 1182 (citing *Gates*, 462 U.S. at 236). In making this determination, the magistrate judge may consider an affiant's experience and expertise. *Jones*, 69 Fed. Appx. at 404. "Only the probability, and not a prima facie showing, of criminal activity is the standard of probable cause." *Nolan*, 199 F.3d at 1183. Accordingly, the standard is "whether the facts presented in the affidavit would 'warrant a [person] of reasonable caution' to believe that evidence of a crime will be found at the place to be searched." *Id.* (citation omitted).

The affidavit in support of the warrant application includes the following information. First, the affidavit states that Defendant and Ms. Valencia purchased from Walgreens large amounts of pseudoephedrine. The affidavit notes that Defendant, in connection with his purchases, provided to Walgreens a New Mexico license showing an address of 1313 South Highway 313 in Bernalillo. The affidavit further states that Ms. Valencia advised the agents that she gave the pseudoephedrine that she purchased to Defendant and that Ms. Valencia exhibited physical symptoms of methamphetamine use. In addition, the affidavit provides that Ms. Valencia showed the agents where Defendant lived, which was at the address that Defendant had provided to Walgreens. The affidavit also provides that, upon arrival at the outside of the fence surrounding the southwestern corner of Defendant's property, the agents smelled a strong chemical odor that they associated with the manufacture of methamphetamine. Finally, the affidavit states that, when TFO Fuentes opened the door to the pink trailer during the agents' protective sweep, he detected a strong chemical odor and saw a can of acetone in a trash can. The Court finds that these facts as presented in the affidavit would warrant a person of reasonable caution to believe that evidence of a methamphetamine lab would be found on Defendant's property.

Defendant argues that the affidavit in support of the warrant was insufficient because there was no evidence linking the manufacture of methamphetamine to the address for which the agents sought a search warrant.  In support of this argument, Defendant cites *United States v. Gonzales*, 399 F.3d 1225 (10th Cir. 2005).  In *Gonzales*, the Tenth Circuit held that there must be "a minimal nexus between the place to be searched and the suspected criminal activity." *Id.* at 1231.  In the case before it, the warrant listed the address of the place to be searched in the caption and described the residence with particularity, but did not include any facts explaining how the address was linked to the defendant.  Thus, the dispositive issue was that the affidavit did not make clear that the place to be searched was the suspect's residence. *See id.*

Unlike the affidavit in *Gonzales*, the affidavit in the instant case provided a connection between the address of the place to be searched and Defendant.  Specifically, in connection with his purchases of pseudoephedrine, Defendant provided a license which showed his address to be 1313 South Highway 313.  Ms. Valencia and her brother confirmed that this was Defendant's address.  Upon arrival at that address, the agents smelled an odor that they associated with the manufacture of methamphetamine.  Accordingly, there was a sufficient nexus between the address of the place to be searched and the suspected criminal activity to satisfy the *Gonzales* standard.  The affidavit thus was sufficient to establish probable cause for issuance of the search warrant.

## II.    Suppression of Defendant's Statements to the Agents

### A.    Whether the Initial Detention of Defendant was Legal

Once the agents jumped over Defendant's fence onto his property, the agents directed Defendant to remain in a chair or on a crate that they placed in his yard.  The agents advised

Defendant that he was being detained while they were waiting for a search warrant and that he was not free to leave.  Thus, the agents effected a warrantless seizure of Defendant.

The government argues that Defendant's detention was lawful under *Michigan v. Summers*, 452 U.S. 692 (1981).  In *Summers*, the Supreme Court reviewed the case of a man who was detained as he was leaving his home and then held while the police executed a search warrant of the house. Thereafter, the man was arrested and searched.  The Supreme Court held, "for Fourth Amendment purposes, . . . a warrant to search for contraband founded on probable cause implicitly carries with it the limited authority to detain the occupants of the premises while a proper search is conducted." *Id.* at 705.  According to the government, Defendant was properly detained pursuant to a valid warrant to search his premises.  The government ignores the fact that Defendant was detained *before* the agents obtained the search warrant.  Under *Summers*, Defendant's detention *during* the execution of the search warrant was valid.  *Summers* does not, however, control whether Defendant's detention while the agents were awaiting the search warrant was equally valid.

In *Illinois v. McArthur*, 531 U.S. 326 (2001), the Supreme Court addressed the issue of whether police officers with probable cause to believe that a man had hidden marijuana in his home violated the Fourth Amendment by preventing that man from entering his home for two hours while they obtained a search warrant.  The Supreme Court explained that "there are exceptions to the warrant requirement.  When faced with special law enforcement needs, diminished expectations of privacy, minimal intrusions, or the like, the Court has found that certain general, or individual, circumstances may render a warrantless search or seizure reasonable."  *Id.* at 949.  In the case before it, the Supreme Court found that the warrantless seizure was not *per se* unreasonable as it involved "a plausible claim of specially pressing or urgent law enforcement need, *i.e.*, 'exigent circumstances.'"

-17-

*Id.* at 950.  Moreover, the Supreme Court found that "the restraint at issue was tailored to that need, being limited in time and scope, and avoiding significant intrusion into the home itself."  *Id.*  In order to determine whether the warrantless seizure was reasonable, the Supreme Court "balance[d] the privacy-related and law enforcement-related concerns."  *Id.*  The Supreme Court concluded that the restriction at issue was reasonable and thus lawful based on the following four factors:  (1) the police had probable cause to believe that the defendant's trailer home contained evidence of a crime and contraband, namely, unlawful drugs; (2) the police had good reason to fear that, unless restrained, the defendant would destroy the drugs before they could return with a warrant; (3) the police did not search the trailer or arrest the defendant before obtaining a warrant but rather imposed a less restrictive restraint, preventing the defendant from entering the trailer unaccompanied; and (4) the police imposed the restraint for a limited, two hour period, which was no longer than reasonably necessary to obtain the warrant.  Finally, the Supreme Court noted:  "We have found no case in which this Court has held unlawful a temporary seizure that was supported by probable cause and was designed to prevent the loss of evidence while the police diligently obtained a warrant in a reasonable period of time."  *Id.* at 951.

In *United States v. Yett*, 85 Fed. Appx. 471 (6th Cir. 2004), the Sixth Circuit applied *Summers* and *McArthur* in determining that the defendant's seizure for one hour while officers awaited the issuance of a search warrant was lawful.  In *Yett*, police were surveilling an apartment where they suspected counterfeiting activities were going on.  One officer left the area to obtain a search warrant.  Meanwhile, the defendant exited the apartment and began to leave.  The remaining officers descended on the scene, forcing the defendant from his car and handcuffing him.  The officers took the defendant to the patio, advised him of his *Miranda* rights and took off the handcuffs.  The warrant arrived one

hour later.  The Sixth Circuit held that the defendant's temporary seizure was supported by probable cause, evidenced by the independent issuance of the warrant, which carried the authority to temporarily detain individuals found at the premises.  Moreover, the Sixth Circuit explained, the defendant's seizure "was calculated to prevent the loss of evidence and freeze the status quo."  *Id.* at 474.  The Sixth Circuit also noted that "the police were diligently obtaining a warrant that was quickly granted."  *Id.*  Accordingly, the Sixth Circuit concluded that "this case falls squarely into the *McArthur* rubric."  *Id.*

The credible evidence presented at the hearing establishes that the agents' seizure of Defendant meets the standard set forth in *McArthur*.  First, as set forth above, the agents had probable cause to believe that Defendant's trailer contained evidence of a methamphetamine lab. Second, also as set forth above, the agents had good reason to fear that, unless restrained, Defendant would destroy the evidence before the warrant was obtained.  Third, the agents did not search the trailer or arrest Defendant before obtaining a warrant but rather imposed a less restrictive restraint, preventing Defendant from entering the trailer accompanied.  Fourth, the agents imposed the restraint only for that period of time during which it was reasonably necessary to obtain the warrant.  Because the warrantless seizure of Defendant thus was supported by probable cause and was designed to prevent the loss of evidence while the agents diligently obtained a warrant in a reasonable period of time, it does not constitute a Fourth Amendment violation.

### B.    Alternative Arguments Regarding Voluntariness of Defendant's Statements

#### 1.    Waiver of Defendant's *Miranda* Rights

*Miranda* requires that procedural safeguards be administered to a criminal suspect prior to "custodial interrogation."  *Miranda v. Arizona*, 384 U.S. 436 (1966).  A defendant's statements

cannot be used against him unless the government shows that he voluntarily, knowingly and intelligently waived his *Miranda* rights. *See Moran v. Burbine*, 475 U.S. 412, 421 (1986). The government bears the burden of proving a valid waiver by a preponderance of the evidence. *See Colorado v. Connelly*, 479 U.S. 157, 168 (1986).

The Supreme Court has held that the Court's inquiry into the validity of a waiver of *Miranda* rights has two dimensions:

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if "the totality of the circumstances surrounding the interrogation" reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived.

*Moran*, 475 U.S. 412, 421 (1986). A determination of whether the waiver of *Miranda* rights is voluntary, knowing and intelligent thus is based on the totality of the circumstances. Under this approach, the Court must examine "several factors including the characteristics of the suspect, such as his [or her] age, intelligence, and education, and the details of the interrogation, such as whether the suspect was informed of his [or her] rights, the length of the detention and the interrogation, and the use or threat of physical force." *United States v. Nguyen*, 155 F.3d 1219, 1222 (10th Cir. 1998), *cert. denied*, 525 U.S. 1167 (1999).

At the hearing, the government presented no evidence regarding Defendant's *Miranda* rights other than TFO Burke's testimony that he was present when Defendant was read his *Miranda* rights and that Defendant "agreed verbally to make a statement." This evidence is insufficient to meet the government's burden of proving a valid waiver. The government has provided no facts to show that Defendant made a free and deliberate choice to waive his rights or that Defendant was fully aware

of the nature of the right he waived. Indeed, the government has provided no details of the interrogation other than the testimony of one witness that an undisclosed individual verbally advised Defendant of his rights. There is no evidence before the Court regarding the demeanor, much less the identity, of the individual who advised Defendant of his rights, the conditions and length of the detention and the interrogation, the interrogator's use or non-use of force or threats or the interrogator's efforts to ascertain any special characteristics of Defendant or ensure that Defendant understood each of his rights. Without such evidence, the Court cannot find that, under the totality of the circumstances, Defendant's waiver of his *Miranda* rights was voluntary, knowing and intelligent. Accordingly, the statements made by Defendant must be suppressed.

### 2.   <u>Voluntariness of Defendant's Confession</u>

The government also bears the burden of establishing by a preponderance of the evidence that the defendant's confession was voluntary. *See United States v. Flores*, 313 F. Supp.2d 1188, 1200 (D. Utah 2004). A confession is involuntary if "the government's conduct causes the defendant's will to be overborne and 'his capacity for self-determination critically impaired.'" *Id.* (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 225-26 (1973)). In evaluating the voluntariness of a confession, the Court must examine the totality of the circumstances to determine whether "the government obtained the statements by physical or psychological coercion or by improper inducement so that the suspect's will was overborne." *Erving L.*, 147 F.3d 1240,1248-49 (10th Cir. 1998). The following factors are relevant to this determination:  "(1) the age, intelligence, and education of the defendant; (2) the length of the detention; (3) the length and nature of the questioning; (4) whether the defendant was advised of her constitutional rights; and (5) whether the defendant was subjected to physical punishment." *United States v. Glover*, 104 F.3d 1570, 1579 (10th Cir. 1997).

As set forth above, the only evidence presented by the government regarding Defendant's confession was TFO Burke's testimony that he was present when Defendant was read his *Miranda* rights and that Defendant "agreed verbally to make a statement."   No evidence was presented regarding the characteristics of Defendant, the length and nature of the questioning, the circumstances surrounding the advisement of Defendant's constitutional rights or whether Defendant was subjected to physical punishment.  The government thus has failed to present any evidence to establish, even by a preponderance, that whoever interrogated Defendant did not obtain Defendant's confession by physical or psychological coercion or by improper inducement such that Defendant's will was overborne.  Accordingly, there is no basis for the Court to find that, based on the totality of the circumstances, Defendant's confession was voluntary.  The government's failure to demonstrate the voluntariness of Defendant's confession thus provides an additional ground for the suppression of his statements.

## **CONCLUSION**

The agents' warrantless entry onto Defendant's property was done with probable cause and exigent circumstances and, accordingly, did not violate Defendant's Fourth Amendment rights. Because there is insufficient evidence that the affidavit in support of the warrant contained false statements, there is no basis for the Court to consider whether the affidavit would have been sufficient without those allegedly false statements.  Similarly, the affidavit was sufficient to establish probable cause for issuance of the search warrant.

The agents' warrantless seizure of Defendant was supported by probable cause and was designed to prevent the loss of evidence while the agents obtained a warrant and, accordingly, did not violate Defendant's Fourth Amendment rights.  The government, however, failed to meet its

burden of proving by a preponderance of the evidence that Defendant's waiver of his *Miranda* rights was voluntary, knowing and intelligent or that Defendant's confession was voluntary.  Accordingly, the statements made by Defendant must be suppressed.

      **IT IS THEREFORE ORDERED** that Defendant's Motion to Suppress **[Doc. No. 30]** is hereby **GRANTED in part** and  **DENIED in part**.

Dated this 27th day of October, 2005.

_____
MARTHA VÁZQUEZ
CHIEF UNITED STATES DISTRICT JUDGE

<u>Attorney for Plaintiff</u>:
Elaine Ramirez

<u>Attorney for Defendant</u>:
Roger Finzel